UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CBS BROADCASTING, INC.,<br>NBC STUDIOS, INC.<br>UNIVERSAL NETWORK TELEVISION, LLC<br>NBC SUBSIDIARY (KNBC-TV), INC.<br>TWENTIETH CENTURY FOX FILM<br>CORPORATION,<br>FOX TELEVISION STATIONS, INC.,<br>ABC HOLDIN COMPANY, INC.,<br>and DISNEY ENTERPRISES, INC.,<br><br>          Plaintiffs,<br><br>vs.<br><br>FILMON.COM, INC.,<br><br>          Defendant. | Case No.<br>10-CV-7532-NRB |

Declaration of Alki David In Support of
FilmOn's Opposition to Plaintiffs' Motion for
Temporary Restraining Order and Preliminary Injunction

I, Alki David, hereby declare and aver that:

1. I am the Chairman and founder of FilmOn, Inc. ("FilmOn"). I have worked in the television industry for approximately twenty (20) years, engaging in a wide range of activities within the industry, including producing, directing and writing television shows. I also founded and launched the first live 24/7 reality television channel. I write this declaration in support of FilmOn's opposition to Network

Plaintiffs' ("Networks") motion for a temporary restraining order and a preliminary injunction in the above-captioned action.

2.  Alex Hartman ("Hartman") is the Executive Vice President of FilmOn. Hartman has founded a number of successful software, media and investment companies, and has been appointed to the boards of several technology and telecommunications organizations in his native Australia.

I.  **FilmOn And Its Technology**

3.  FilmOn is a service which, through the Internet, enables its subscribers, by using a computer or mobile device, to: (a) view network television programs which are broadcast by the Networks through their local affiliate stations; and (b) view television programs which are broadcast by itself and local cable stations.

4.  Viewing of both network programs and local cable programs on FilmOn is in real-time; that is, it is streamed live and is *not* delayed or available for viewing before or after the live broadcast by the network affiliate which broadcasts network programs in local regional markets. FilmOn does not electronically or digitally store, maintain or capture to be placed in memory, any programs which it makes available to its subscribers, either network or local cable station programs. Neither FilmOn nor its subscribers, therefore, can retrieve any program which was made available through its portal.

5.  FilmOn's network program service operates by providing a platform which captures digital television signals broadcast for free by the Networks over-the-

2

air, and by making these signals accessible to FilmOn subscribers through the Internet. FilmOn's platform is accessible to consumers on their computers or mobile devices through FilmOn's website. Other companies, such as Sling Media, also capture the networks' free over-the-air digital signal and offer it to their customers through the Internet. Rather than enabling the customer to view the network programs captured on their computers or mobile devices, however, these other companies enable the consumer to view the captured digital signal on their television set by purchasing and connecting to that television a digital box which accesses the Internet to capture the signal. Importantly, even though companies like Sling Media capture the network's digital signal and enable the consumer to relay it to their television through a box connected to that television and FilmOn captures that signal and enables consumers to view it on their computers or mobile devices, both of these services capture the signal using the Internet.

6. The digital signals captured by FilmOn and Sling Media, through its Slingbox product, are broadcast by the Networks over-the-air for free. In essence, therefore, FilmOn and Sling Media merely act as conduits for the digital signals which the Networks broadcast over-the-air free of charge. Access of the viewing public to the Networks' over-the-air broadcasts of these digital signals is limited by many elements which block the transmission of over-the-air digital signals. For example, over-the-air signals cannot penetrate mountains or buildings constructed with certain materials. Because the Internet is not subject to these elements which block over-

3

the-air digital signals, FilmOn's subscribers have access to these digital signals without being subject to these limitations.

7. FilmOn is expressly permitted to enable subscribers to access the cable station programs accessible through it by agreements with the local cable stations which broadcast these programs. It is FilmOn's understanding that U.S. Copyright laws permit it to make Network free over-the-air network signals available to subscribers, and therefore that it is not necessary to enter such agreements with the Networks.

8. In order for a subscriber to view any programs on FilmOn's website, the subscriber must first purchase and download proprietary software developed by FilmOn. Upon purchasing this software, the subscriber must enter a license agreement with FilmOn for the right to use the software.

9. To be clear, all subscribers must purchase FilmOn's proprietary software. And although subscribers who avail themselves of the access FilmOn provides to local cable station programs must pay an additional fee to view these programs, subscribers who simply take advantage of FilmOn's access to network programs need not pay any additional fee to FilmOn beyond the aforementioned software licensing fee. FilmOn, therefore, does not charge its subscribers any fee for the right to access the network programs it makes available for viewing.

**II. Alleged Irreparable Harm to the Networks**

10. In this lawsuit, I understand that the Networks have complained that FilmOn's service will cause them irreparable harm because: (a) they would lose

4

control over the distribution of their programs; (b) they would be exposed to "virtually unlimited" piracy; and (c) their ability to exploit new media markets to create new revenue streams would be preempted. FilmOn's service, however, would not result in any of these perils to the Networks.

### A.  Alleged Loss of Control Over Distribution

11.  Regarding their alleged loss of control over the distribution of their programs, the Networks complain that their brands would be tarnished by the adult-oriented programs made available by FilmOn, by the advertising available on the FilmOn website and by the technical quality of FilmOn transmissions.

12.  Any adult-oriented program accessible through FilmOn is not easily identifiable by a subscriber as such. Upon viewing FilmOn's website homepage, a subscriber is presented with a number of buttons displaying television stations, including those of the networks. In order to access any adult-oriented station, or even know that such a station is available through FilmOn, a subscriber must scroll through many different stations to locate such a station. Importantly, the proximity of any cable station button to a network station button on the FilmOn website cannot cause the networks irreparable harm, because it can be easily relocated on the website to avoid any perceived harm.

13.  Also, the technical quality of FilmOn's streaming is superior. FilmOn makes its network broadcasts available in high definition. Furthermore, it has developed proprietary technology to deliver compressed images and video and to load balance its network for scalability.

5

### B.  Alleged Exposure to Unlimited Piracy

14.  Regarding their alleged exposure to "unlimited piracy" of network programs made available by FilmOn, the Networks complain that they cannot ensure the protection of their copyrighted programs.

15.  In order to protect its streams from piracy, FilmOn employs the Common Scrambling Algorithm developed and maintained in accordance with DVB standards, in addition to its own proprietary encryption technology which can lock a video stream between the server and the viewer.

### C.  Alleged Preemption of Exploitation of New Media Markets

16.  Regarding FilmOn's alleged preemption of the Networks' ability to exploit new media markets, the Networks complain that FilmOn's streaming will deprive them of both advertising revenue and licensing opportunities. Although this appears to be an atttractive argument for the Networks at first blush, upon closer examination, it does not withstand rational scrutiny.

17.  The Networks complain that, by making network programs available to FilmOn subscribers simultaneously at the time of their *live* broadcast, the Networks are deprived of advertising revenue which they might derive from their own *delayed* on-line broadcast of their programs, because FilmOn is competing for those advertising dollars. This makes no sense. FilmOn's *live* streaming of network programming does not in any way compete for advertising dollars which might be generated for the networks as a consequence of their *delayed* on-line broadcast.

18.     FilmOn's service simply provides a viewer with an alternative channel for viewing a network program, through the Internet, *at the same time as* the Network broadcasts the program live on television. No FilmOn network program viewer, therefore, could possibly be drawn away from the on-line network broadcast of a program, because that on-line network broadcast does *not* occur at the same time as the live FilmOn broadcast, but rather afterwards. Indeed, every FilmOn viewer is an *additional* viewer of the *live* network broadcast who otherwise might not have watched the live network broadcast at all. And as the Networks note, every viewer of the Networks' *delayed* on-line broadcast is another additional viewer who might not have watched the network program at all. FilmOn, therefore, simply is not competing for on-line viewers with the Networks. Like the networks' *delayed* on-line option, FilmOn's *live* on-line option provides additional viewers who would never have watched the *live* network program. Consequently, FilmOn does not divert any advertising dollars away from the Networks' on-line broadcasts.

19.     The Networks also complain that, by making network programs available to FilmOn subscribers simultaneously with the live network broadcasts, FilmOn is competing for viewers, and therefore advertising dollars. It is possible that some small percentage of viewers will view a live network program made available by FilmOn on its website instead of on their television sets. But this does not in any way translate into a loss of advertising dollars for the Networks. FilmOn does not alter or edit the commercials placed within the programs by the Networks or their affiliates. Whether a viewer is viewing the live network broadcast of a program via

FilmOn or on a television set, therefore, they will see the same advertisement. In fact, due to the *additional* viewers watching the network program as a consequence of FilmOn's service, the Networks would be able to charge its advertisers more for commercials, thereby augmenting, *not* depressing, revenue from its advertisers.

20. The Networks' attempt to emasculate the enormously beneficial effect FilmOn will have on the Network's advertising revenue by stating, without any personal knowledge, that FilmOn has no intention of measuring the number of additional viewers it will bring to the Networks' live broadcasts. This is simply not true. FilmOn has entered an agreement with comScore, the very audience measurement company mentioned by the networks, to measure its viewership. Furthermore, FilmOn has created and undertakes its own data analysis method which enables it to measure which network programs and commercials the viewer watches, the length of time for which she watches those programs and commercials, and to assemble a demographic profile of each viewer. FilmOn, therefore, has the ability to demonstrate to the Networks and their advertisers precisely how many additional viewers watch each of the Network programs to which it provides its subscribers access.

21. The Networks also complain that, by making network programs available to FilmOn subscribers simultaneously with their live broadcasts, FilmOn somehow threatens their ability to license, for substantial fees, their network programs for retransmission, to cable, satellite and telecom providers.

22. The Networks imply that these cable, satellite and telecom companies would not enter license agreements with them if their programs are made available by FilmOn. There is no reason to believe this would be the case. Like over-the-air network broadcasts, the viewing of network programs broadcast by cable, satellite and telecom companies occurs on a traditional television set. FilmOn's target market is laptop and mobile telephone users. These laptop and mobile telephone FilmOn users, therefore, would not otherwise watch on a television set the network programs they watch using FilmOn's service. On the contrary, their viewership will likely occur outside their homes, such as in cafes, on the street or on a train. These viewers, therefore, would not be drawn away from their television sets which broadcast programs through cable, satellite or telecom companies. Consequently, there is very little, if any, likelihood that the cable, satellite or telecom companies would be deterred from agreeing to pay the networks' substantial licensing fees to broadcast network programs made available by FilmOn to its subscribers.

23. The Networks also complain that, by making network programs available to FilmOn subscribers simultaneously with the Networks' live broadcasts, FilmOn threatens their ability to license their programming abroad for syndication and endangers their newly negotiated licensing agreements with cable providers, such as Comcast, to make their programs available to viewers on an on-demand basis *after* the original broadcast has occurred. Again, I emphasize that FilmOn *only* makes network programs available for live broadcast *simultaneously* with the Networks' free over-the-air broadcasts. Any licensing deal for foreign syndication or for on-demand

9

viewing with a cable company, however, by definition must result in a *delayed* broadcast. There is no rational reason to believe, therefore, that a foreign syndicated or on-demand viewer would be less inclined to watch, and therefore that the Networks' deals which make it possible for these viewers to watch would be negatively impacted, simply due to FilmOn's alternative channel for viewing these network programs, a computer or mobile device, at the time of the *live* broadcast in the United States.

24.     The Networks have also suggested to FilmOn that their relationships with their affiliates will be harmed by FilmOn's reach. In essence, they have complained that, because the Internet, which is FilmOn's vehicle for providing its service, is not circumscribed by the same technological limitations as the airwaves or cables, as are over-the-air Network and cable system broadcasts respectively, the broadcast of a network program by a network affiliate which is made available by FilmOn to its subscribers will be accessible to those subscribers *even if* they are physically located in another network affiliate's exclusive broadcasting territory. Such an invasion by one affiliate of another affiliate's territory, say the Networks, would breed hostility amongst the Networks and their affiliates and may result in violations of the Networks' contracts with their affiliates.

25.     In a good faith effort to preempt any such problems for the Networks, FilmOn is in the process of programming its Geo-Filtering technology, which is a cornerstone of its technological platform, to limit the geographic reach of the network programs it makes available to subscribers in order to prevent the network

programming signals it makes available to subscribers from straying outside the territorial limits of the affiliate which is broadcasting those signals over-the-air or through cable systems. Once this process is complete, therefore, no FilmOn subscriber will be able to access a network program unless that program is simultaneously being broadcast by the Network *in the affiliate territory* where the subscriber is located. Geo-Filtering technology enables FilmOn to identify the precise location of a subscriber's computer or mobile device, through that subscriber's IP address, and therefore to enable or block a signal to that computer or mobile device.

### III. Irreparable Harm to FilmOn

26. If enjoined from making network programs available to its viewers, FilmOn would most likely suffer a fatal blow from which it could not recover.

27. FilmOn began offering its subscribers the ability to access network programs in the United States on September 27, 2010. For several months prior to this launch date, FilmOn engaged in a massive marketing, promotional and public relations campaign to introduce and make the public aware of its network program services. This campaign was successful, generating substantial media and public interest in FilmOn and its network program offerings.

28. Since launching its network program service in the United States, FilmOn has received approximately 650,000 unique network program viewers. In the short time period since its United States' launch, FilmOn's daily network program

audience is approximately 40,000. The majority of FilmOn's viewers, approximately fifty-five (55) percent, view network programs when they visit FilmOn's website.

29. FilmOn's network program audience growth is attributed not only to its successful and expensive marketing and promotional efforts, but also to word-of-mouth. FilmOn viewers have informed others about the availability of access to network programs on FilmOn and those individuals have, in turn, told others, thereby resulting in the exponential growth of FilmOn's network program audience.

30. If potential viewers visit FilmOn's website in search of network programs, but are unable to find them because FilmOn has been enjoined from making them accessible during the pendency of this lawsuit, those viewers most likely will not ever return to FilmOn. Once news travels that FilmOn is unable to provide the network program services it has claimed, in its marketing and promotional campaign, then FilmOn's reputation will be forever tarnished and viewers and potential viewers will forever be deterred from visiting FilmOn.

31. Moreover, viewers and potential viewers who are unable to access network programs on their computers or mobile devices through FilmOn would turn to FilmOn's competitors in the marketplace. Several competitors are either currently operating or will soon be operating: (a) IVI, Inc. offers viewers access to network programs in New York, Seattle and Los Angeles through the Internet; (b) Google TV has announced that it will soon offer the streaming of network programs; (c) Apple TV has signaled that it is in the process of creating a service to offer the streaming of network programs; and (d) Sling Media, through its product Slingbox, offers viewers

access to network program streams on the Internet if they purchase a device to attach to their television sets.

32. Once consumers begin to use the service of one of these competitors they will quickly develop brand loyalty to that competitor and FilmOn likely will never see that customer again. This is especially true at this early stage of development of television program streaming through the Internet.

33. Not only would an injunction cause FilmOn to lose a substantial portion of its customer base and potential customers, but it would cause significant erosion to FilmOn's market capitalization, resulting in substantial shareholder losses. Independent assessments have estimated that FilmOn's market capitalization is currently approximately $800 million and that, if enjoined from enabling viewers to access network programs, that capitalization would plummet to approximately $400 million.

34. Moreover, if enjoined from providing viewers with access to network programs, FilmOn's current negotiations with many potential business partners most likely would be stopped in their tracks. Many FilmOn partners, and potential partners, have taken an interest in FilmOn primarily due to its ability to offer access to network programs; that is, these potential partners believe that network programs drive traffic to FilmOn and, without this traffic, it is unlikely these potential partners would be interested in becoming a partner with FilmOn.

35. Furthermore, all of these negative effects of an injunction would be exacerbated by the fact that this drama will be widely reported in the media. And as

the Networks comprise the very media which will be reporting the story, they will surely use their platform to paint FilmOn as a villain and a pirate of copyrighted network programs. Not having access to such an enormous and influential media platform, FilmOn will not have the opportunity to adequately and fairly present its view that the Copyright laws permit it to provide consumers with access to network programs.

36. In sum, should an injunction issue, FilmOn will likely lose its ability to function as a going concern and the Networks will have won without the Court adjudicating the underlying legal question of whether FilmOn has the right, as an entity whose activities are excepted from the Copyright laws, to retransmit network programs to make them available to viewers through the Internet.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: November 16, 2010               \_\_\_\_\_/AlkiDavid/_____
                                              Alki David