UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CBS BROADCASTING INC.,
NBC STUDIOS, INC.,
UNIVERSAL NETWORK TELEVISION, LLC,
NBC SUBSIDIARY (KNBC-TV), INC.
TWENTIETH CENTURY FOX FILM CORPORATION,
FOX TELEVISION STATIONS, INC.,
ABC HOLDING COMPANY INC.,
and DISNEY ENTERPRISES, INC.,

     Plaintiffs,

     v.

FILMON.COM, INC.,

     Defendant.

Case No. 1:10-cv-7532-NRB

### REPLY DECLARATION BY CHRISTOPHER SCOTT MORROW IN SUPPORT OF PLAINTIFFS APPLICATION FOR AN ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

I, Christopher Scott Morrow, declare under penalty of perjury:

1.     My name is Christopher Scott Morrow.  I am an associate at Arnold & Porter LLP.  I submit this Declaration in connection with the Reply Memorandum in Support of the Application for an Order To Show Cause for a Preliminary Injunction and Temporary Restraining Order  submitted by plaintiffs in this matter.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the Memorandum of Law in Support of Motion For Temporary Restraining Order and/or Preliminary Injunction submitted by the plaintiffs in *WPIX, Inc. v. ivi, Inc.*, Case 1:10-cv-7415-NRB (S.D.N.Y., filed September 28, 2010).

3.    Attached hereto as Exhibit 2 is a true and correct copy of the Reply

Memorandum Of Law In Support Of Motion For Temporary Restraining Order and/or

Preliminary Injunction submitted by the plaintiffs in *WPIX, Inc. v. ivi, Inc.*, Case 1:10-cv-

7415-NRB (S.D.N.Y., filed September 28, 2010).

4.    Attached hereto as Exhibit 6 is a true and correct copy of an article from

www.broadcasting cable.com entitled FilmOn Announces Launch of Online Pay Service

Delivering HD TV Stations, by John Eggerton, September 28, 2010.

I declare under penalty of perjury that the foregoing is true and correct.

_____

C. Scott Morrow

Executed on November 16, 2010.

Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

WPIX, INC.,
WNET.ORG,
AMERICAN BROADCASTING COMPANIES, INC.,
DISNEY ENTERPRISES, INC.,
CBS BROADCASTING INC.,
CBS STUDIOS INC.,
THE CW TELEVISION STATIONS INC.,
NBC UNIVERSAL, INC.,
NBC STUDIOS, INC.,
UNIVERSAL NETWORK TELEVISION, LLC,
TELEMUNDO NETWORK GROUP LLC.,
NBC TELEMUNDO LICENSE COMPANY,
OFFICE OF THE COMMISSIONER OF BASEBALL,
MLB ADVANCED MEDIA, L.P.,
COX MEDIA GROUP, INC.,
FISHER BROADCASTING-SEATTLE TV, L.L.C.,
TWENTIETH CENTURY FOX FILM CORPORATION,
FOX TELEVISION STATIONS, INC.,
TRIBUNE TELEVISION HOLDINGS, INC.,
TRIBUNE TELEVISION NORTHWEST, INC.,
UNIVISION TELEVISION GROUP, INC.,
THE UNIVISION NETWORK LIMITED PARTNERSHIP,
TELEFUTURA NETWORK,
WGBH EDUCATIONAL FOUNDATION,
THIRTEEN,
and PUBLIC BROADCASTING SERVICE,

        Plaintiffs,

        v.

IVI, INC. and TODD WEAVER,

        Defendants.

------------------------------------------------------------------X

10 Civ. 07415-NRB

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ......................................................................................................3

ARGUMENT .............................................................................................................................5

I.   PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON
     THE MERITS ...................................................................................................................6

     A.   Defendants' Unauthorized Streaming Of TV Programming Over The
          Internet Infringes Plaintiffs' Exclusive Public Performance Rights.......................6

     B.   Defendants Cannot Properly Rely Upon The Section 111 Cable
          Compulsory License As A Defense To Their Infringement ...................................7

II.  PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF
     A PRELIMINARY INJUNCTION...................................................................................14

III. THE BALANCE OF HARDSHIPS BETWEEN PLAINTIFFS AND
     DEFENDANTS TIPS DECIDEDLY IN THE PLAINTIFFS' FAVOR ...........................18

IV.  A PRELIMINARY INJUNCTION WOULD NOT HARM THE PUBLIC
     INTEREST.......................................................................................................................18

CONCLUSION...........................................................................................................................20

## PRELIMINARY STATEMENT

On September 13, 2010, defendants ivi, Inc. ("ivi") and its founder and chief executive officer, Mr. Todd Weaver, began streaming worldwide over the Internet, for profit, numerous New York, New York and Seattle-Tacoma, Washington broadcast television stations and the copyrighted programming on those stations -- 24 hours a day, seven days a week -- all without the consent of the affected stations or copyright owners, in open and notorious violation of the Copyright Act. That activity, apparently timed to coincide with a critical period of the year for broadcasters, network programmers and many content owners (the start of the fall season when new programming is introduced), has already severely damaged the plaintiffs and threatens further irreparable injury for which defendants have no ability to compensate. The applicable law establishes that defendants have no legal right to stream plaintiffs' copyrighted programming over the Internet without authorization, and the Court should enter an order putting a halt to defendants' continuing infringement as promptly as possible.

The defendants are exploiting some of the most valuable and recognizable intellectual property created in the United States -- including the copyrighted television programming owned by plaintiffs and their affiliates who represent (1) the principal broadcast television networks (ABC, CBS, CW, FOX, NBC, Telefutura, Telemundo and Univision); (2) leading distributors of non-commercial educational programming (PBS, WNET.ORG and WGBH); (3) a major professional sports league (Major League Baseball); (4) major motion picture studios (Walt Disney Studios, 20th Century Fox and NBC Universal); and (5) the individual New York and Seattle broadcast television stations whose signals defendants are streaming over the Internet (WPIX, WNET, WABC, WCBS, WNBC, WNYW, WWOR, WNJU, WXTV, WFUT, KIRO, KOMO, KZJO, KSTW and KCPQ).

Defendants' conduct infringes plaintiffs' exclusive rights, under Section 106 of the Copyright Act, 17 U.S.C. 106, to perform publicly, and to authorize others to perform publicly, plaintiffs' copyrighted works. It is well-established that the act of streaming copyrighted works over the Internet constitutes a public performance within the meaning of Section 106. *See infra* p. 7. The issue in this case is whether defendants can carry their burden of establishing a proper defense to their infringing activities. They cannot.

Defendants have asserted in the press that "copyright technicalities" permit their massive piracy, (*see* Declaration of Scott Morrow ("Morrow Decl."), Ex. 1), and that they are entitled to resell plaintiffs' content for their own commercial gain by paying a fee to the Copyright Office that likely would amount to a total of about $100 per year. In an attempt to justify their piracy, defendants claim their Internet TV streaming service qualifies for the 30-year-old "compulsory license" in 17 U.S.C. § 111 which allows "cable systems," under narrowly-defined circumstances, to retransmit broadcast television programming without having to negotiate with individual copyright owners. As discussed below, there are no such "copyright technicalities" that excuse defendants' massive infringement of copyright; defendants' Internet streaming service is not a "cable system;" and defendants are not entitled to the compulsory license set forth in Section 111 of the Copyright Act or anywhere else. The rulings and other pronouncements over several years from the Register of Copyrights -- the government official that Congress has entrusted with the responsibility of administering the Section 111 license -- make clear that the defendants' supposed Section 111 defense for its infringement is a sham. *See infra* pp. 8-14.

Every day defendants place hundreds of copyrighted programs belonging to plaintiffs and others onto the Internet where they become available for worldwide dissemination -- all without

the authorization of the affected copyright owners; all in direct, unfair competition with plaintiffs' licensed services; all without concern for the vulnerability of the programming to further unauthorized viral reproduction and distribution; and all for defendants' personal commercial gain.  Unless restrained by this Court, pending the outcome of this litigation and permanently, the loss of control over the distribution of plaintiffs' broadcast signals and copyrighted programming, the preemption of plaintiffs' opportunities to license content over new media, the misappropriation of plaintiffs' ability to develop foreign markets, and the other unlawful conduct of defendants threaten plaintiffs with enormous and irremediable losses.  Such losses cannot be compensated by damages because damages cannot be accurately measured and because defendants' start-up service will never be able to pay them.  Moreover, unless restrained, defendants' model for pirating will be imitated by others (as it already has been), exacerbating the harm to plaintiffs.[1]

## FACTUAL BACKGROUND

On September 13, 2010, defendants began operating their for-profit commercial service that provides subscribers with online access to all of the programming telecast by numerous broadcast television stations serving either the New York, New York or Seattle-Tacoma, Washington markets (collectively, the "Stations").  Plaintiffs have not yet had any discovery of defendants and thus do not know the details of their technical operations.  Based upon publicly-available materials, however, it appears that defendants capture the signals of the Stations in their local markets (New York and Seattle), transmit those signals to defendants' servers, packetize them for transmission over the Internet, and stream them to paying customers around the world

---

[1]  Shortly after defendants introduced their service, another site, FilmOn.com, began offering a similar service.  Certain of the plaintiffs here filed suit against FilmOn on October 1, 2010, the week it commenced operation.  *CBS Broadcasting Inc., et al., v. FilmOn.com, Inc.*, No. 10 Civ. 7532UA (S.D.N.Y.).  The plaintiffs in that suit have identified it as a related case to this action.

using a peer-to-peer system that, among other things, utilizes bandwidth provided by those customers. *See* Morrow Decl., Ex. 2 ("End User License Agreement" advising subscribers that ivi "will utilize the processor, bandwidth and hard drive (or other memory or storage hardware) and/or cache of your computer (or other applicable device)" to provide its streaming service).

Defendant Weaver has been quoted as saying that the ivi service is available "anywhere on the planet" (*see* Morrow Decl., Ex. 3), and, indeed, it is. For example, a recent article on an Australian website about defendants' service quoted "Hal Bringman, a spokesperson for ivi TV" as stating that "Anyone in Australia can access the ivi TV service for US$4.99 a month (A$5.36). All they need is a broadband connection." *See* Morrow Decl., Ex. 4.

According to press reports, defendants plan to expand the ivi service to capture signals from additional markets every 45 days, beginning with Los Angeles, Chicago, and San Francisco; they plan to distribute their service, including plaintiffs' signals and/or copyrighted programming, to iPad, iPhone and Android mobile devices; and they plan to distribute their service to users of various third-party set-top boxes. *See* Morrow Decl., Ex. 5.

To take advantage of defendants' service, including access to all of the programming on the Stations, an individual with Internet access need only (a) access the ivi website (http://www.ivi.tv/) on his or her computer; (b) create an account by providing an e-mail address and a password; (c) agree to the terms of an end user license; and (d) pay defendants a fee. After a 30-day free trial, that fee is $4.99 per month. For an additional fee of $0.99 per month, the subscriber is able to have the programming that defendants stream copied. An ivi subscriber may download, install and use on a computer (or other applicable device) the ivi TV application.

That application allows the subscriber to view and to have copied the television programming streamed by defendants.

Defendants have not obtained the authorization of any of the plaintiffs to stream over the Internet or otherwise use the signals of the Stations and/or the copyrighted programming on those stations. Beginning the day after defendants commenced their unlawful service, several of the plaintiffs demanded that defendants, no later than the following week, cease and desist from the unauthorized streaming of their signals and programming over the Internet. Defendants initially responded to certain of the plaintiffs on Friday, September 17, 2010, representing that they were "open to engaging in discussions" to "explore more direct contractual agreements" with certain plaintiffs (*see* Morrow Decl., Ex. 6) -- just as they apparently have done with the owners of non-broadcast programming they stream. However, on the following Monday morning, September 20, 2010, before any such discussions occurred or even could have occurred, defendants commenced an improper anticipatory lawsuit in federal district court in Seattle, Washington against some (but not all) of the plaintiffs here. *ivi, Inc. v. Fisher Commc'n, Inc., Civil Action No. 10-cv-1512* (W.D. Wash.). At the same time, defendants issued a press release announcing their lawsuit and circulated that press release to various media outlets. *See* Morrow Decl., Ex. 7. On September 28, 2010, plaintiffs commenced the instant action before this Court.[2]

## ARGUMENT

A preliminary injunction or temporary restraining order should issue in a copyright infringement case under 17 U.S.C. § 502 where the plaintiff shows (1) "either (a) a likelihood of

---

[2] The defendants in the Seattle action (which include some of the plaintiffs here) moved to dismiss that action the same day the complaint was filed in this action. *See* Morrow Decl., Ex. 8. Under settled law in both the Second and Ninth Circuits, the Seattle action should be dismissed.

success on the merits or (b) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping decidedly in [plaintiff's] favor;" (2) "that [plaintiff] is likely to suffer irreparable injury in the absence of an injunction;" (3) that "the balance of hardships [between the plaintiff and defendant] tips in the plaintiff's favor;" and (4) "that the public interest would not be disserved by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal citations and quotations omitted).

While the *Salinger* court adopted a legal standard consistent with the "traditional principles of equity" required by the Supreme Court in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), it acknowledged that the Second Circuit Court of Appeals "has nearly always issued injunctions in copyright cases as a matter of course upon a finding of likelihood of success on the merits." 607 F.3d at 76. The court indicated that these historical precedents were instructive, and quoted favorably from Chief Justice Roberts's concurring opinion in *eBay*:

> [C]ourts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases. This "long tradition of equity practice" is not surprising, given the difficulty of protecting a right to *exclude* through monetary remedies . . . . When it comes to discerning and applying those standards, in this area as others, a page of history is worth a volume of logic.

*Id.* at 82 (*quoting* 547 U.S. at 395).

## I.   PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   Defendants' Unauthorized Streaming Of TV Programming Over The Internet Infringes Plaintiffs' Exclusive Public Performance Rights

To establish infringement under the Copyright Act, a plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 699 (2d Cir. 1998) (citations omitted). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five

exclusive rights described in § 106." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (citation and internal quotation marks omitted).

Plaintiffs are copyright owners of some of the most valuable and well-recognized programming aired by television stations in this country, including content aired on the Stations that defendants are streaming over the Internet without authorization. *See* Morrow Decl., Ex. 9. And it is well-established that such streaming constitutes a public performance within the meaning of Section 106(4) of the Copyright Act and requires a license. *See United States v. ASCAP*, 2010 WL 3749292, at *5 (2d Cir., Sept. 28, 2010); *United States v. ASCAP*, 485 F. Supp. 2d 438, 441 (S.D.N.Y. 2007).

In a similar case, a court entered a preliminary injunction against another service that, like defendants' service, sought to retransmit television programming over the Internet without authorization. In doing so, the court held:

> [The record] shows that plaintiffs are likely to succeed in showing that defendants are unlawfully publicly performing plaintiffs' copyrighted works in the United States. Defendants do so by transmitting (through use of "streaming" technology) performances of the works to the public by means of the telephone lines and computers that make up the Internet. 17 U.S.C. Section 101. This activity violates plaintiffs' rights to perform their works publicly and to authorize others to do so.

*Twentieth Century Fox Film Corp., v. iCraveTV*, 2000 WL 255989, at *7 (W.D. Pa. Feb. 8, 2000).

**B.**     **Defendants Cannot Properly Rely Upon The Section 111 Cable Compulsory License As A Defense To Their Infringement**

On a motion for preliminary injunction in a copyright infringement action, defendants bear the burden of establishing that they qualify for the Section 111 compulsory license as a defense to their infringement of plaintiffs' public performance rights. *See Patry on Copyrights*, § 10:9.50 (2010) (*citing Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S.

418, 429 (2006)); *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 320 (S.D.N.Y. 2008). Defendants cannot meet that burden.

1. Section 111 permits "cable systems" to make "secondary transmissions" of "primary transmission[s]," "simultaneously," under certain conditions and only where those "secondary transmissions are" "permissible" under the "rules, regulations, or authorizations of the Federal Communications Commission" ("FCC"). *See* 17 U.S.C. §§ 111(c)-(f). In short, Section 111 allows cable systems (such as Time Warner Cable or Comcast), under certain circumstances and subject to compliance with FCC rules, to retransmit the copyrighted programming on broadcast television stations (such as WPIX or WNBC in New York City) -- without having to negotiate for separate copyright licenses from the individual owners of the copyrighted programming and other works on those stations. Section 111 represents a narrow limitation on the exclusive rights otherwise accorded copyright owners by Section 106 and one that Congress considered to be justified given the circumstances surrounding the cable industry in 1976. *See generally A Report of the Register of Copyrights: Satellite Home Viewer Extension and Reauthorization Act Section 109 Report* at 2-8 (June 2008) ("Register's Section 109 Report") (describing for Congress the nature, scope and purpose of the Section 111 license), Morrow Decl., Ex. 10; *cf. Fame Publ'g Co. v. Alabama Custom Tape, Inc.,* 507 F.2d 667, 670 (5th Cir. 1975) (because "the compulsory license provision is a limited exception to the copyright holder's exclusive right to decide who shall make use of his [work]," it should be "construed narrowly lest the exception destroy, rather than prove, the rule").

While the Section 111 compulsory license covers the need for copyright clearance, it does not afford cable systems or anyone else the right to retransmit the *signals* of broadcast stations (as opposed to the programming on those stations) without the stations' consent. Section

325 of the Communications Act, 47 U.S.C. § 325, specifies the circumstances under which "cable operators" and other "multichannel video programming distributors" ("MVPDs") must obtain the consent of a broadcast station before retransmitting its signal (known in the industry as "retransmission consent"). Defendants refuse to obtain retransmission consent.

2.     During the more than three decades following passage of Section 111, the Register of Copyrights[3] has considered whether various types of new video distribution technologies qualify for the Section 111 license. The Register has made clear that Section 111 does not "encompass any and all new forms of retransmission technology . . . ." 57 Fed. Reg. at 3285. While new systems may qualify even if they are not the "types envisioned by Congress when it enacted Section 111" (Register's Section 109 Report at 199), the Register

_____

[3] "The Copyright Office [headed by the Register of Copyrights] is a federal agency with authority to promulgate rules concerning the meaning and application of Section 111." *Satellite Broadcasting & Commc'ns Ass'n of America v. Oman*, 17 F.3d 344, 347 (11th Cir. 1994) (citations omitted). Given the central role the Register plays in connection with the Section 111 license, the Register's interpretations of Section 111 are due "deference" and "cannot be ignored." *Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*, 836 F.2d 599, 608 (D.C. Cir. 1988) (footnotes omitted); *see also id.* at 609-11 (distinguishing cases, not involving Section 111, where courts declined to accord deference). The court explained:

> We have emphasized that the compulsory licensing scheme was a break from the traditional copyright regime of individual contracts enforced in individual lawsuits. If we agreed that the Copyright Office had no power to interpret the statute, every dispute over the meaning of the statute could give rise to an infringement action where, as this case suggests, enormous damage claims are commonplace. If, on the other hand, reasonable interpretations of the statute by the Copyright Office are due judicial deference, a copyright holder's incentive to bring infringement actions that are based on interpretations other than those of the Copyright Office would be reduced. Since Congress consciously rejected traditional, contract-based implementation as unworkable, a holding that forced resolution of every dispute in an infringement or declaratory judgment action would be unfaithful to this policy choice and antithetical to Congress' central concern of providing a low cost transfer of copyrighted materials.

*Id* at 608.

Defendants have not sought or obtained any ruling from the Copyright Office that they qualify for the Section 111 cable license.

also has made clear that only "new systems that are *substantially similar* to those systems that already use Section 111 should be subject to the license." *Id.* at 181 (emphasis added).

As the Register has properly concluded, services that stream broadcast signals nationwide over the open Internet are "vastly different" from other services eligible for the Section 111 compulsory license. *See* Report of the Register of Copyrights, *A Review of the Copyright Licensing Regimes Covering Retransmission of Broadcast Signals,* at 97-99 (Aug. 1, 1997), (Morrow Decl., Ex. 11); Register's Section 109 Report at 182 (a service that streams broadcast programming over the open Internet is "not analogous to the technologies currently using the statutory licenses"); Statement of Marybeth Peters, Register of Copyrights Before the House Subcommittee on Courts, and Intellectual Property, 106th Cong., 2d Sess., at p. 9 (June 15, 2000) ("[T]he cable compulsory license could not reasonably be interpreted to include Internet retransmissions;" "I believe that the section 111 license does not and should not apply to Internet transmissions;" "[I]f there is to be a compulsory license covering such retransmissions, it will have to come from newly enacted legislation and not existing law").

The Register's determination has particular applicability to defendants. Unlike cable systems that qualify for the Section 111 license, defendants do not provide their service to defined geographic areas; they do not deliver content over an infrastructure they have built or over which they otherwise have any control; and they do not use secure closed transmission paths. Unlike Section 111 licensees, defendants do not obtain retransmission consent from any broadcast station before retransmitting its signal. Defendants claim that because they operate over the open Internet, they are not subject to any rules whatsoever. *See* Morrow Decl., Ex. 6. Defendants also refuse to comply with FCC rules to ensure the protection of plaintiffs' content and signals. Defendants are not remotely, let alone

substantially, similar to those cable systems that qualify for the Section 111 license and accordingly they are not entitled to the Section 111 license.

3.    Defendants say that "Section 111 defines 'cable system' very broadly. It encompasses secondary transmissions 'by wires, cables, microwave, or other communications channels.'" *See* Morrow Decl., Ex. 6. The full definition of "cable system" in Section 111(f)(3) states:

> A "cable system" is a facility, located in any State, Territory, Trust Territory, or Possession, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service.    For purposes of determining the royalty fee under subsection (d)(1), two or more cable systems in contiguous communities under common ownership or control or operating from one head and shall be considered as one system.

17 U.S.C. § 111(f)(3). Defendants do not operate the type of "facility" that comes within the above definition.

In a case analogous to the one now before this Court, so-called "satellite carriers" sought to avail themselves of the Section 111 compulsory license. Like defendants here, the carriers retransmitted the signals of television broadcast stations from New York and other cities to paying subscribers located throughout the United States.    The carriers made those retransmissions via satellite in the same way that defendants use the Internet. Like defendants here, the carriers pointed to the definition of cable system in Section 111(f)(3) and claimed they fell within it. The Register disagreed.

The Register concluded, based upon his interpretation of Section 111, that satellite carriers are not entitled to the Section 111 license. *See* Cable Compulsory License; Definition of

Cable System, 57 Fed. Reg. 3284 (Jan. 29, 1992). And a court of appeals affirmed the Register's interpretation of Section 111. *See Satellite Broad. & Commc'ns Ass'n of Am. v. Oman*, 17 F.3d 344 (11th Cir. 1994) (according Register's interpretation deference and overruling a contrary prior opinion of the court of appeals).[4]

As the Register concluded in that matter, "[S]ection 111 is clearly directed at localized retransmission services," and not at a service that retransmits broadcast signals to subscribers located throughout the entire United States. *See* 57 Fed Reg. at 3290-92; *id.* at 3292 ("Congress intended the compulsory license to apply to localized retransmission services, and not nationwide retransmission services such as satellite carriers."). In determining that nationwide retransmission services, such as those offered by satellite carriers, are not eligible for the Section 111 compulsory license, the Register made a thorough examination of the language of the statute. The Register considered the definition of "cable system." The Register also considered that definition in light of Section 111 as a whole and reasoned that nationwide broadcast retransmission services would not fit within the complete statutory framework. *See* 57 Fed. Reg. at 3292 (referring to Register's "[c]onsideration of section 111 as a whole"); 37 C.F.R. § 201.17(n) (2010) ("Satellite carriers and satellite resale carriers are not eligible for the cable compulsory license based upon an interpretation of the whole of section 111 of title 17

---

[4] Congress determined that the Section 111 provisions, geared to the 1976 cable industry, required significant revision to be able to accommodate satellite carrier technology. Accordingly, Congress afforded satellite carriers a separate compulsory license. *See* 17 U.S.C. § 119; 17 U.S.C. § 122; *National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 11-13 (2d Cir. 2000) (concluding that carrier's retransmissions of programming outside the United States exceeded the scope of the license and constituted infringement of the public performance right). In crafting a new compulsory license tailored to the nationwide service that satellite carriers provide, Congress departed from the Section 111 cable compulsory license in several respects, including the manner in which the compulsory licensing royalty must be computed. *See generally* Register's 109 Report at 94-101 (discussing differences between Sections 111 and 119).

of the United States Code"); 57 Fed. Reg. at 3290 (identifying statutory terms that have no meaning for a service that provides nationwide retransmissions).

A court must, of course, "look to the 'common sense' of the statute . . ., to its purpose, [and] to the practical consequences of the suggested interpretations . . . for what light each inquiry might shed." *New York State Commission on Cable Television v. FCC,* 571 F.2d 95, 98 (2d Cir. 1978).[5]  The Register made that analysis in the satellite carrier proceeding and the same analysis demonstrates that the nationwide (and worldwide) streaming of broadcast signals over the Internet does not qualify for the Section 111 compulsory license. That same analysis, affirmed by the Eleventh Circuit Court of Appeals, further supports the conclusion that defendants are not a "cable system" under Section 111(f)(3) of the Copyright Act.[6]

---

[5] One of the most significant practical consequences of the interpretation advanced by defendants is that, if accepted, it would put the United States in violation of several international treaties. *See* Register's Section 109 Report at 188-89 (identifying treaties that would be violated by construing Section 111 as defendants advocate).   Furthermore, a principal reason that Congress in 1976 decided to grant cable systems a compulsory license was that the market had failed to make the programming available. The Register has observed that that is not the case when it comes to the Internet.   *See id.* at 188 ("In fact, the lack of a statutory license provides an incentive for parties to find new ways to bring broadcast programming to the marketplace and that market, by all accounts, continues to grow.").  Defendants are themselves an example of this very point; they apparently do negotiate the rights for certain non-broadcast programming.

[6] Even if defendants were such a "cable system," they would not qualify for the Section 111 license.  Section 111(c) affords the compulsory license only for the carriage of stations that is "permissible under the rules, regulations, or authorizations of the Federal Communications Commission." *See* 17 U.S.C. § 111(c)(1).  By refusing to obtain retransmission consent (*see supra* pp. 2, 4) and to comply with other FCC signal carriage rules, defendants fail to satisfy the permissibility condition in Section 111.   Plaintiffs reserve the right to demonstrate that defendants' service does not qualify for the Section 111 license in other respects and infringes other rights of plaintiffs.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IN THE ABSENCE OF A PRELIMINARY INJUNCTION

Plaintiffs are broadcasters and/or content owners; their businesses depend on retaining the ability to control the time, place, manner, and quality of their programming transmissions and the use of their copyrighted content.  The plaintiffs possess "a property interest in the copyrighted material," *see Salinger*, 607 F.3d at 81, and will suffer harm to that "legal interest" that "cannot be remedied after a final adjudication."  *Id.; see New Era Publications Int'l, ApS v. Henry Hold & Co.*, 695 F. Supp. 1493 (S.D.N.Y. 1988) ("[T]he justification of the copyright law is the protection of the commercial interest of the artist/author.").

As the accompanying declarations establish, defendants' unauthorized streaming of plaintiffs' broadcast signals and programming threaten to injure the plaintiffs and diminish the value of their businesses and their intellectual property in multiple serious respects:

- *Destruction of the Value of Licensed Programming Content.*  Defendants' unauthorized streaming over the Internet of plaintiffs' television programming content significantly undermines the value of such content that cable systems, satellite services and other multichannel video programming distributors pay significant sums for the right to transmit to their subscribers.  *See, e.g.,* Declaration of Jaime Rodriguez ("Rodriguez Decl."), ¶9; Declaration of Stephen Segaller ("Segaller Decl."), at 2; Declaration of Therese M. Weiler  ("Weiler Decl."), ¶9; Declaration of Benjamin N. Pyne ("Pyne Decl."), ¶¶7, 11; Declaration of Eric Brass ("Brass Decl."), ¶ 9; Declaration of Martin D. Franks ("Franks Decl."), ¶¶5, 14, 26-27; Declaration of Eric Meyrowitz ("Meyrowitz Decl.), ¶¶4-7, 12.

- *Disruption of Advertising Models/Loss of Revenue.*  ivi's conduct threatens broadcasters with major losses in advertising revenue.  A first run television program is aired at one specific time, rerun at other specific times in a particular time zone, and then, frequently, made available over the Internet at other specific times.  Defendants frustrate this control, including by streaming both East Coast and West Coast network stations enabling, for example, California viewers to watch programs from New York stations hours before the programming is available to local broadcasters.  This significantly disrupts advertising models, as Seattle-targeted advertising will not be viewed by Seattle-based viewers who watch the New York City station feed and vice-versa.  Because measuring agencies do not and likely will not choose to measure ivi's viewership, the number of viewers watching a particular program will be underestimated, causing significant lost advertising revenue.  *See, e.g.,* Rodriguez Decl., ¶¶11, 13; Pyne Decl., ¶¶8-10, 13; Franks Decl., ¶16. Meyrowitz Decl., ¶¶8-9.

- *Interference with Distribution Agreements.* Content owners enter into distribution arrangements with broadcasters that typically limit the times, geographical areas and mode of permitted distribution. For example, distribution online is not permitted for certain content. Broadcasters in turn enter into distribution agreements with local cable systems and other multichannel video programming distributors that include the right to retransmit their broadcast programming simultaneously. Defendants' disruption of those controls is likely to diminish the value for both sides. By offering its service without authorization from plaintiffs and without the kind of limitations commonly included in arms-length distribution agreements, defendants undermine licensees that pay for the right to broadcast and retransmit plaintiffs' content and signals. Such conduct diminishes the value of the content to licensees, will undercut plaintiffs' relationships with licensees and will undermine plaintiffs' ability to generate distribution revenue in the future. *See, e.g.,* Rodriguez Decl., ¶ 10; Segaller Decl., at 2; Brass Decl., ¶¶ 10; 13; Franks Decl., ¶14; 28-29; Meyrowitz Decl., ¶10.

- *Interference with Licensed Websites.* Plaintiffs typically make content available after its initial broadcast on their own websites for specific time periods, and license the content to other Web services for other specific time periods. Defendants' unauthorized Internet service competes with both of these practices, and frustrates the content owners' temporal controls. Moreover, plaintiffs go to great lengths to ensure that distribution of programming over the Internet is subject to digital rights management and access controls. Defendants' peer-to-peer system distributes pieces of content to the hard drives of unwitting subscribers, potentially allowing for further uncontrolled distribution. And, defendants disregard the restrictions content owners impose for online distribution, restrictions that legitimate sites follow. *See, e.g.,* Pyne Decl., ¶12; Franks Decl., ¶¶ 7-10; 16

- *Disruption of Foreign Markets.* Distribution of United States programming to foreign countries is controlled by multiple agreements, and subject to foreign legal systems. Foreign revenues are a significant source of income for the plaintiffs, and defendants threaten it. While defendants have claimed they do not offer their service in other countries, numerous press reports assert the contrary, and plaintiffs are aware of foreign residents who have opened ivi accounts without difficulty. By retransmitting plaintiffs' programming in foreign markets without regard to the restrictions followed by those that play by the rules, defendants are causing the same type of harm as in the domestic market. *See, e.g.,* Segaller Decl., at 2; Pyne Decl., ¶14; Franks Decl., ¶¶ 24-25.

- *Loss of control over content and viral infringement.* By distributing plaintiffs' programming in digital form over the Internet -- without plaintiffs having any say about the employment of copy protection measures -- ivi exposes plaintiffs to virtually unlimited piracy. Once digital copies are available and released to the public on the Internet, vast viral infringement could follow. In fact one of the functions of the service is to make and preserve digital copies. Plaintiffs would have no way to know where those copies are or to otherwise track their further copying and distribution on the Internet. *See, e.g.,* Franks Decl., ¶6; Meyrowitz Decl., ¶11.

The courts also have recognized several additional bases to support a finding of irreparable harm that are applicable here.

*First,* injunctive relief is necessary because of the difficultly in quantifying the damages and lost profits associated with defendants' infringement. *See Salinger,* 607 F.3d at 81 (explaining that even though irreparable harm cannot be presumed, "[h]arm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer. . . . [C]ourts have tended to issue injunctions [in the context of copyright infringement cases] because 'to prove the loss of sales due to infringement is . . . notoriously difficult.'"). There is no way to adequately quantify the lost revenue from advertising and from licensees of plaintiffs' content as a result of defendants' pilfering of consumers from legitimate distribution channels. Advertising revenue will not reflect those viewers who switch to the ivi platform. Moreover, it will be difficult to adequately assess the diminished value of plaintiffs' content to authorized licensees if unauthorized distribution is allowed to proceed unabated. *See Pearson Educ., Inc. v. Vergara,* 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010) (holding in context of a copyright infringement case decided after *Salinger* that the irreparable harm element was satisfied because plaintiff "should not be expected to suffer a decline in . . . sales and profits -- an injury difficult to quantify -- owing to [defendant's] infringement.").

*Second,* a defendant's inability to compensate the plaintiff for the damages it inflicted is a factor in determining whether preliminary injunctive relief is warranted. *See Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971) (considering the "unlikelihood that defendant . . . would, in any event, be able to satisfy a substantial damage award" to support a finding of irreparable harm); *Hoxworth v. Blinder, Robinson & Co.,* 903

F.2d 186, 206-07 (3d Cir. 1990) (noting that a defendant's inability to satisfy a judgment can constitute the sort of irreparable injury necessitating injunctive relief); *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir. 1986) ("Difficulty in collecting a damage judgment may support a claim of irreparable injury.").

Plaintiffs here would be entitled to recover statutory damages of anywhere between $200 (innocent infringement) and $150,000 (willful infringement) per program infringed. *See* 17 U.S.C. § 504(c)(2). Defendants are currently streaming hundreds of copyrighted programs each and every day and plan to stream even more by adding stations from additional markets. As a startup operation, defendants will not be able to satisfy the likely damages award. Accordingly, economic remedies will not suffice and a preliminary injunction is necessary to protect the plaintiffs.

*Finally*, plaintiffs have no adequate remedy at law where infringing activity is likely to continue in the absence of an injunction. *See Pearson*, 2010 WL 3744033, at *4; *Microsoft Corp. v. ATEK 3000 Computer, Inc.*, 2008 WL 2884761 (E.D.N.Y. July 23, 2008) (plaintiff alleging unauthorized distribution of software demonstrated that there was no adequate remedy at law because "there is no assurance in the record against defendant's continued violation of plaintiff's copyrights."). The potentially enormous amount of damages that could be at issue here strongly compels the inference that the defendants will not be able to satisfy a judgment. The facts here are very different from *Rosewood Apartments Corp. v. Perpignano*, 200 F. Supp. 2d 269, 278-79 (S.D.N.Y. 2002), where the court denied a motion for preliminary injunction in a real estate dispute because the limited partners offered no basis for the claim that defendant would be unable to satisfy a judgment.

## III. THE BALANCE OF HARDSHIPS BETWEEN PLAINTIFFS AND DEFENDANTS TIPS DECIDEDLY IN THE PLAINTIFFS' FAVOR

Defendants would not face any real harm in delaying the launch of their service until after a final adjudication on the merits of the substantial copyright infringement claims presented here. Defendants do not run an established business that would suffer disruption -- they only began offering their service a few weeks ago. At the moment, defendants are not receiving *any* revenue from their service; they offer their subscribers a 30-day free trial period and any current subscribers are still in the free trial period. Even if defendants were to receive payment, they are not entitled to the illegitimate proceeds from their infringement and can refund the payments to subscribers. Because defendants will not suffer any real harm from an injunction prior to a full adjudication on the merits, and because plaintiffs will suffer substantial and irreparable harm, including consumer confusion, reputational damage, loss of control over intellectual property, and loss of audience and revenue during the period of defendants' continued infringement, the balance of hardships weighs heavily in favor of plaintiffs.

## IV. A PRELIMINARY INJUNCTION WOULD NOT HARM THE PUBLIC INTEREST

Courts considering requests for injunctive relief in copyright cases "must consider the public's interest." *Salinger*, 607 F.3d at 82. "The public interest that copyright law is designed to promote is the wide availability of creative works." *Matthew Bender & Co., Inc. v. West Publishing Co.*, 240 F.3d 116, 124 n.8 (2d Cir. 2001). As the Second Circuit Court of Appeals has noted:

> The object of copyright law is to promote the store of knowledge available to the public. But to the extent it accomplishes this end by providing individuals a financial incentive to contribute to the store of knowledge, the public's interest may well be already accounted for by the plaintiff's interest.

*Salinger*, 607 F.3d at 82.   The Copyright Act serves the public interest by providing incentives for copyright owners to create, invest in, and disseminate creative content.

Defendants unlawfully transmit copyrighted television broadcasts without authorization from the content owners or their licensees.   In so doing, defendants misappropriate plaintiffs' copyrighted content without regard for the exclusive rights granted by law to its creators or the negotiated terms of contracts governing its distribution. They subvert the rules imposed by Congress and the relevant regulatory agencies to govern retransmissions of such content, and to protect national and local broadcasters from misuse of their programming and unfair competition by duplicating broadcasts from other markets.

In sum, defendants' service (and the proliferation of similar services that are likely to emerge, if defendants are not enjoined) threaten virtually every income stream that plaintiffs derive from the creation and dissemination of copyrighted television programming.   By doing so, defendants undermine the core public interest that copyright law is intended to protect and encourage content owners to license their product for distribution on media platforms other than broadcast television to ensure that they retain control over Internet distribution.   An injunction prohibiting defendants from continuing to stream plaintiffs' programming over the Internet without obtaining prior consent therefore serves the public interest and the underlying policy of the Copyright Act.   *See Salinger*, 607 F.3d at 82); *accord L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 492 (2d Cir. 1976) (failure to enter injunction protecting copyrighted works would frustrate the constitutional demand of "promoting progress in the arts."); *Warner Bros. Entm't, Inc. v. Carsagno*, 2007 WL 1655666, at *6 (E.D.N.Y., June 4, 2007) ("[T]he public interest would not be disserved by a permanent injunction, as there is a greater public benefit in securing the integrity of

[plaintiff's] copyrights than in allowing [defendant] to make [the] copyrighted material available to the public.").

## CONCLUSION

For the reasons set forth above and in the accompanying declarations and exhibits, the Court should enter an order enjoining defendant ivi, Inc. and its officers, employees, agents, and those in privity with them, from streaming over the Internet the copyrighted content of any of the plaintiffs during the pendency of this litigation.  We respectfully ask the Court to establish an expedited schedule for further briefing, and to set a preliminary injunction hearing on the earliest available date.

By:    _Peter L. Zimroth_

Peter L. Zimroth
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York
(212) 715-1000
*peter.zimroth@aporter.com*

-- and --

Robert Alan Garrett
Hadrian R. Katz
C. Scott Morrow
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000
*robert.garrett@aporter.com*
*hadrian.katz@aporter.com*
*scott.morrow@aporter.com*

*Counsel for Plaintiffs*

Dated:  October 8, 2010

Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X
                                                          :
WPIX, INC.,                                               :
WNET.ORG,                                                 :
AMERICAN BROADCASTING COMPANIES, INC.,                    :
DISNEY ENTERPRISES, INC.,                                 :
CBS BROADCASTING INC.,                                    :
CBS STUDIOS INC.,                                         :
THE CW TELEVISION STATIONS INC.,                          :
NBC UNIVERSAL, INC.,                                      :
NBC STUDIOS, INC.,                                        :
UNIVERSAL NETWORK TELEVISION, LLC,                        :
TELEMUNDO NETWORK GROUP LLC.,                             :
NBC TELEMUNDO LICENSE COMPANY,                            :
OFFICE OF THE COMMISSIONER OF BASEBALL,                   :
MLB ADVANCED MEDIA, L.P.,                                 :
COX MEDIA GROUP, INC.,                                    :
FISHER BROADCASTING-SEATTLE TV, L.L.C.,                   :
TWENTIETH CENTURY FOX FILM CORPORATION,                   :
FOX TELEVISION STATIONS, INC.,                            :
TRIBUNE TELEVISION HOLDINGS, INC.,                        :
TRIBUNE TELEVISION NORTHWEST, INC.,                       :
UNIVISION TELEVISION GROUP, INC.,                         :
THE UNIVISION NETWORK LIMITED PARTNERSHIP,                :
TELEFUTURA NETWORK,                                       :
WGBH EDUCATIONAL FOUNDATION,                              :
THIRTEEN,                                                 :
and PUBLIC BROADCASTING SERVICE,                          :
                                                          :
          Plaintiffs,                                     :
                                                          :
              v.                                          :        10 Civ. 07415-NRB
                                                          :
IVI, INC. and TODD WEAVER,                                :
                                                          :
          Defendants.                                     :
-----------------------------------------------------------------------------------X

## REPLY MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER
## <u>AND/OR PRELIMINARY INJUNCTION</u>

Under ivi's view of Section 111, *anyone* with a computer, an Internet connection and a TV antenna can become a "cable system" entitled to compulsory licensing; anyone may sell for profit over the Internet to subscribers nationwide (indeed worldwide) access to multiple broadcast television stations and hundreds of copyrighted television programs on those stations each and every day, seven days a week -- without obtaining any authorization, licenses or consent from anyone to do so, without being subject to any regulation of any sort by any governmental body and without having any control over the distribution network being used to deliver the copyrighted programming. All that is necessary, in ivi's view, is the payment of $100 annually to the Copyright Office.

Congress never intended such a result when it adopted the Section 111 license in 1976. As discussed below, Congress accorded compulsory licensing to a highly regulated and localized cable industry that developed and controlled (at great cost) its own infrastructure -- and that, in Congress' view, would not have been able to provide diverse programming to the communities they were franchised to serve absent a compulsory license. The language and legislative history of Section 111, the pronouncements of the Register of Copyrights (the government official entrusted by Congress with administering the Section 111 license (*see* Pl. Memo. at 9), sound policy considerations and common sense make clear that ivi has failed to carry its burden of excusing its massive infringement of copyrighted programming. *See* Pl. Memo. at 7-8 (discussing ivi's burden).

ivi's acknowledged goal is to disrupt the means by which broadcast programming reaches the public. Indeed, ivi accompanied the lawsuit it filed in Seattle against so-called "big media" with a press release claiming that its service would be "highly disruptive" to the entire media industry. *See* Pl. Memo. Morrow Decl., Ex. 7. And ivi publicly boasted that it would "eat the lunch" of those cable and satellite operators who must comply with existing rules. *See* Pl. Memo. Morrow Decl., Ex. 5. If not enjoined, ivi's will make countless unauthorized performances of plaintiffs' copyrighted works, which cannot be undone after

the fact; and it would severely disrupt existing markets, as ivi admittedly intends, causing irreparable harm to plaintiffs.  In addition, if ivi is not enjoined, many others will flock to ivi's fabricated "rule free zone" – as has already started to occur (*see* Pl. Memo. at 3 n.1) -- and begin selling for a profit over the Internet plaintiffs' valuable copyrighted programming. A preliminary injunction is necessary to prevent further harm, and to preserve that status quo pending a final determination on the merits.

     1.     ivi says the Copyright Office has "confirmed that Section 111 encompasses secondary transmissions over the Internet." ivi Opp. at 8.  To the contrary, the Register of Copyrights testified before Congress, unequivocally, that the streaming of broadcast programming to subscribers nationwide over the Internet does *not* qualify for the cable compulsory license:

> [T]he cable compulsory license could not reasonably be interpreted to include Internet retransmissions . . . . I believe that the section 111 license does not and should not apply to Internet transmissions . . . . [I]f there is to be a compulsory license covering such retransmissions, it will have to come from newly enacted legislation and not existing law.

Statement of *See* H.R. Rep. 94-1476 at 89 Register of Copyrights Before the House Subcommittee on Courts, and Intellectual Property, 106th Cong., 2d Sess., at p. 9 (June 15, 2000) (Declaration of Scott Morrow ("Morrow Reply Decl."), Ex. 1.)

     ivi ignores this testimony and, instead, provides the Court with selected pages from the Register's 2008 Section 109 Report, claiming that the Copyright Office "retreated" from its position. Opp. at 9. That claim is baseless. As the Section 109 Report makes clear:

> The Office continues to oppose an Internet statutory license that would permit any website on the Internet to retransmit television programming without the consent of the copyright owner.  Such a measure, if enacted, would effectively wrest control away from program producers who make significant investments in content and who power the creative engine in the U.S. economy.  In addition, a government-mandated Internet license would likely undercut private negotiations leaving content owners with relatively little bargaining power in the distribution of broadcast programming.  Further, there is no proof that the Internet video market is failing to thrive and is in need of government assistance through a licensing system.  In fact, the lack of a statutory license provides an incentive for

> parties to find new ways to bring broadcast programming to the marketplace and
> that market, by all accounts, continues to grow.

Register's Sec. 109 Report, at 188 (Pl. Memo, Morrow Decl., Ex. 10).

ivi confuses the distinction between the "Internet," on the one hand, and use of "Internet Protocol" ("IP") to deliver video programming ("IPTV"), on the other hand. The Internet is a global system of millions of interconnected private, public, academic, business and government computer networks, to which content providers and end-users connect using their own respective Internet Service Providers ("ISP.") IPTV is a term for a transmission protocol or format in which video is delivered in digital "packets" that include an IP address header. Despite the inclusion of the word "Internet" in the term and consistent with ivi's own examples, IPTV-formatted video is typically delivered through a closed, "end-to-end" system in which the distributor owns and/or controls the wires and routers in the entire delivery network at every point, including the "last mile" to the subscriber's home. Unlike ivi, these services that deliver IPTV-formatted video do not relinquish control over the content and distribution path to the user's ISP and the other worldwide interconnected networks that form the public Internet.

The Register recognized these important distinctions in determining Section 111 eligibility. The Register concluded that the retransmission of programming using IP technology is a new and competitive technology that does not in and of itself make a service ineligible for the Section 111 license. *See* Register's Section 109 Report at xi-xii & 194-200. However, a service such as ivi's that chooses to stream programming over the public Internet (regardless of whether it uses IPTV or some other format) is not eligible for the Section 111 license. *See id.* at xii & 181-89. As the Register explained, use of IPTV as a new distribution technology does not raise any issues that would have concerned Congress in enacting Section 111. But the use of the Internet to distribute programming is quite different because, as the Register noted, the Internet is wholly unregulated, poses serious questions about signal security, reflects none of the market failures that justified the original

3

Section 111 compulsory license and is the subject of separate international treaty obligations which prohibit retransmissions of broadcast programming over the Internet. *See id.* ivi claims it is unclear which specific treaties would be violated (Opp. at 15-16) but the Register identifies them on pages 188-89 of her Section 109 Report.

    2.    ivi argues that the Copyright Office has not issued "any interpretations" or "rulings" concerning the Internet that should be accorded "deference." Opp. at 10-11. But the Register has expressed the consistent view -- for over ten years -- in testimony and reports to Congress that Internet services such as ivi's are not and should not be eligible for the Section 111 compulsory license. During that period, Congress has amended the Copyright Act (including Section 111) on several occasions, without expressing any disagreement with the Register's view. The Register's interpretation of the Section 111 license is entitled to deference. *See Utah v. Evans*, 536 U.S. 452, 472 (2002) (Court would accord deference to an administrative agency's interpretation of a statute where Congress was aware of that interpretation and re-enacted the statute without change).

    Furthermore, the Register has ruled that a service providing broadcast programming to subscribers nationwide (let alone internationally, as ivi has done) does not qualify for the Section 111 license:

> The Office notes that at the time Congress created the cable compulsory license, the FCC regulated the cable industry as a highly localized medium of limited availability, suggesting that Congress, cognizant of the FCC's regulations and the market realities, fashioned a compulsory license with a local rather than a national scope. This being so, the Office retains the position that a provider of broadcast signals be an inherently localized transmission media of limited availability to qualify as a cable system. 56 FR 31595 (July 11,1991).

62 Fed. Reg. 18705, 18707 (April 17, 1997) (Morrow Reply Decl., Ex. 2). *See also* 57 Fed. Reg. 3284, 3292 (January 29, 1992) (Bierman Decl., Ex. 6) ("It is apparent that the operation of section 111 is hinged on the FCC rules regulating the cable industry. . . . Nothing in the statute or its legislative history suggests that Congress intended section 111 to apply to nationwide retransmission services such as satellite carriers . . ."). That ruling, to

which a federal court of appeals afforded deference in the context of another nationwide service found ineligible for Section 111 (satellite carriers), also leaves no doubt that ivi is ineligible for the Section 111 license. *See SBCA v. Oman,* 17 F.3d 344 (11th Cir. 1994).

ivi states that "if a satellite company can be a cable system under Section 111," then surely "transmissions over the wires or other communications channels of the Internet must also fit." Opp. at 8. But satellite companies are *not* "cable systems" under Section 111. Only by repeatedly, and improperly, citing a 1991 Eleventh Circuit decision -- that the Eleventh Circuit expressly superseded in 1994 when it affirmed the Register's contrary ruling in *SBCA v. Oman, supra* -- can ivi make such an erroneous statement. *See* Pl. Memo. at 11-12.[1]

ivi also cites the *Eastern Microwave* and *Hubbard* decisions that, it says, "addressed the definition of 'cable system'" and did so "broadly" to include retransmissions of New York signals to "cable subscribers in Las Vegas and 600 other locations." Opp. at 12. And ivi claims the *Insight* decision "considered and rejected the notion that Section 111 requires a cable system to build and own the wires." *Id.* But none of these decisions involved a dispute over the meaning of "cable system" or the scope of the Section 111 cable compulsory license, and none of the defendants in these cases sought to retransmit television programming directly to subscribers. The common issue was whether the defendants, who transported programming to cable systems at the request of those systems, qualified as "passive carriers" within the meaning of an entirely different portion of Section 111, 17 U.S.C. § 111(a)(3). ivi does not seek to rely upon the "passive carrier" license in Section

---

[1] Congress has created separate compulsory licenses under the Copyright Act for the retransmission of broadcast television programming by satellite carriers in Section 119 (for distant station signals) and Section 122 (for local signals). *See* Pl. Memo. at 12 n.4. In enacting the Section 119 license, Congress took account of the nationwide scope of the satellite industry by including provisions designed to protect the exclusivity of local network affiliates by limiting the importation of duplicating network programming from distant markets. *See* 17 USC § 119(a)(2)(B); *CBS Broadcasting Inc. v EchoStar Communs. Corp.,* 450 F3d 505 (11th Cir. 2006). Although ivi's service is also distributed on a nationwide basis, the Section 111 license to which it claims entitlement includes no such protections for the exclusivity rights of local television stations, and ivi asserts it is exempt from the companion FCC rules providing those protections.

111(a)(3), nor could it. Indeed, in a decision from this Court not cited by ivi, Judge Kaplan concluded that another service that sought to retransmit radio signals directly to subscribers nationwide over telephone lines did not qualify for Section 111(a)(3), presciently noting:

> This view is supported by "'the "common sense' of the statute . . . and the practical consequences of the suggested interpretations,'" considerations which the Court is obliged to take into account. . . . We live in an era of rapid technological change. The possibilities for the capture and retransmission of copyrighted material over the Internet, for example, are enormous. . . . Holding that Kirkwood is a "carrier," notwithstanding that the essence of his business is the retransmission of copyrighted materials, would threaten considerable mischief.

*Infinity Broadcasting Corp. v. Kirkwood*, 63 F. Supp. 2d 420, 426 (S.D.N.Y. 1999).

      3.     ivi's references to various Section 111 licensees that utilize IPTV technology to distribute programming (*see* Opp. at 9-10) provide no support for ivi and instead only confirm the distinction between those licensees and ivi itself. The licensees to which ivi refers provide service to discrete local communities via an infrastructure and closed private network that it controls all the way up to the subscriber's home; none provides a nationwide service over the Internet as does ivi. *See, e.g.* Bierman Decl., Ex. 11 (identifying areas served by Arkwest TV); Bierman Decl., Ex. 13 (same for SureWest). While ivi provides the instructions for completing the statements of account that cable operators file with the Copyright Office (Bierman Decl., Ex. 14), it never provides any of the actual statements of account -- each of which reflects the highly localized and private nature of the service being provided by IPTV cable systems to which it refers. *See, e.g.*, Morrow Reply Decl. Exhibits 3, 4 & 5 (statements of account for ArkWest and Sure West) (identifying in Space D "each separate community served by the cable system").

      ivi's repeated attempts to equate its service with AT&T's U-verse service are unavailing. ivi is nothing like AT&T, which uses IP technology to transmit video over a closed, secure, private network that it owns and controls from end-to-end. AT&T does not provide a nationwide service as does ivi, but rather serves local areas. Importantly, AT&T also has entered into retransmission consent agreements with each of the broadcasters whose

6

stations it retransmits, unlike ivi. The Register has recognized the critical distinction between AT&T's U-verse service, on the one hand, and a service like ivi's, on the other, which streams programming to subscribers nationwide over the Internet. *See* Register's Section 109 Report at 181-89 & 194-200.

    4.    ivi claims it falls "squarely within" all the "definitional aspects" of Section 111(f)) but then provides a truncated version of this definition. *See* Opp. at 6-7. The complete text is as follows:.

> A "cable system" is a facility, located in any State, territory, trust territory, or possession of the United States, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service. *For purposes of determining the royalty fee under subsection (d)(1), two or more cable systems in contiguous communities under common ownership or control or operating from one headend shall be considered as one system.*

17 U.S.C. § 111(f)(3). The italicized language that ivi omitted from its opposition is language on which the Register relied to support the conclusion that Section 111 does not apply to nationwide retransmission services. As the Register explained, terms such as "head end" and "contiguous communities" in Section 111(f) simply have no relevance to entities (like satellite carriers and ivi) that provide the same service to subscribers located nationwide. *See* 57 Fed. Reg. at 3290 ("[S]ection 111 is clearly directed at localized transmission services. The second part of the section 111(f) definition of a cable system refers to 'headends' and 'contiguous communities,' two concepts which do not have any application to a nationwide retransmission service such as satellite carriers"); *id.* (discussing definition of "distant signal equivalent" in Section 111(f) which also has no application to a nationwide service). This conclusion is further supported by the reference to "any State, territory, trust territory or possession" in the first sentence of the definition. A nationwide service is simply not a "cable system."

7

Furthermore, under the Section 111(f) definition, the "facility" must receive and make the secondary transmissions. Therefore, in ivi's case the "facility" at issue is not simply its server but also the millions of computers that make up the Internet itself. It is that network of computers -- which are located throughout the world and not just in "any State, trust, territory or possession" and which are not under ivi's control -- that completes the "secondary transmissions" to "subscribing members of the public." Indeed, ivi says that under the FCC staff's *SkyAngel* decision, 25 FCC Rcd. 38879 (Media Bur. 2010), it is ivi's ISP and not ivi that provides the requisite "transmission path" and delivers the programming to the ultimate user. Opp. at 17-18. If that decision and ivi's reliance upon it are correct (which are neither conceded not disputed), that provides further support for the conclusion that ivi is not a cable system under Section 111.

Finally, as the Register has noted, one must look to the language of the entire Section 111 (and not simply the Section 111(f) definition) to determine whether a particular service qualifies for the compulsory license. *See* 62 Fed. Reg. at 18707 ("[S]ection 111 must be construed in accordance with Congressional intent and as a whole, not just in reference to one particular section"); Pl. Memo. at 12. As the Register concluded:

> § 111, taken as a whole, demonstrates that Congress intended to create a compulsory license only for local entities. There are numerous references to cable systems as local facilities. For example, § 111 refers to agreements between a cable system and a television broadcast station "in the area in which the cable system is located," and to television stations "within whose local service area the cable system is located." Similarly, the definition of "cable system" refers to the rules applicable to cable systems "in contiguous communities." Finally, the retransmission of Canadian broadcast signals depends on whether "the community of the cable system is located more than 150 miles from the United States-Canadian border." These references would have no meaning when applied to the nationwide retransmission facilities employed by satellite carriers.

56 Fed. Reg. 31580, 31588 (July 11, 1991) (Bierman Decl., Ex. 5). Consideration of the same statutory provisions supports the conclusion that ivi is ineligible for compulsory licensing.

5.      ivi's repeated references to the fact that certain of the plaintiffs themselves make some of their own programming available on the Internet through services such as Hulu.com or

mlb.com (ivi Opp. at 18, 20 & 21) are inapposite. ivi ignores the fact that plaintiffs do so pursuant to negotiated licenses and/or through Internet sites that they own. By doing so, they obtain not only fair market compensation but also are able to ensure the security of the transmission channels and the quality of the programming that they distribute and to impose other relevant conditions -- considerations wholly absent with ivi. Moreover, the notion that plaintiffs' choice to license their own copyrighted content in this manner somehow renders an operator like ivi free to take and to distribute the same programming on an unlicensed and wholly unregulated basis makes no sense.

6.     ivi's request for the Court to construe Section 111 "broadly" (Opp. at 7-8) also fails. *See Tasini v. New York Times, Inc.*, 206 F.3d 161, 168 (2d Cir. 2000) ("when a statute sets forth exceptions to a general rule, we generally construe the exceptions 'narrowly in order to preserve the primary operation of the [provision]'") (*quoting Commissioner v. Clark*, 489 U.S. 726, 739 (1989)), *aff'd on other grounds NY Times Co. v. Tabini*, 533 U.S. 483 (2001).

ivi says Congress concluded that the public interest would be served by allowing "cable systems" to retransmit broadcast programming pursuant to a compulsory license. But Congress reached that conclusion because it believed at the time there was a market failure with regard to licensing of cable retransmission of broadcast signals. *See* H.R. Rep. 94-1476, at 89 (1976). Congress also reached that conclusion only with respect to "cable systems" and cautioned that it was doing so in part because of the highly regulated nature of the existing cable industry:

> [T]here is no simple answer to the cable-copyright controversy. In particular, any statutory scheme that imposes copyright liability on cable television systems must take account of the intricate and complicated rules and regulations adopted by the Federal Communications Commission to govern the cable industry.

*Id.* (Bierman Decl., Ex. 4).

There is no support for the notion that Congress intended the Section 111 license to be construed so broadly as to apply to the unregulated retransmission of broadcast signals or to new technologies for which there exists a functioning market for licensing those same rights. The existence of Hulu, iTunes, mlb.com, and other similar sites and services (Opp. at 18)

demonstrates that there is a robust, functioning market for the licensing of Internet retransmissions of broadcast programming. *See supra* pages 2-3 & 8-9.

Had Congress determined that the public interest would be served by having anyone and everyone retransmit broadcast programming, it could easily have written Section 111 to accomplish that result. Every new technology (including, for example, satellite carriers and, more recently, digital broadcasters capable of transmitting multiple program streams) and, indeed, every individual with a computer and Internet access would be able to avail themselves of compulsory licensing. But Congress did not do so. It accorded the compulsory license to the industry that it knew and adopted a simple definition of cable system tailored to that industry. As the Register of Copyrights has repeatedly and correctly observed,

> Congress did not intend to extend the cable compulsory license to every video delivery system capable of retransmitting broadcast signals to subscribers. The cable compulsory license was the subject of intensive debate and controversy from 1966 to 1976. Nothing in the legislative history suggests that Congress intended an open-ended definition of the entities qualifying for the license.

56 Fed. Reg. at 31592; *see also* 56 Fed. Reg. at 31590 (Section 111 "should not be given a wide scale interpretation which could, or will, encompass any and all new forms of retransmission technology.   An overbroad interpretation exceeds the intent of Congress in creating the compulsory license as a response to a specific legislative policy issue").

ivi is unlike any other service ever found eligible for the Section 111 cable compulsory license. It admits it streams broadcast signals and the programming on those signals to subscribers *nationwide* over the Internet making use of a network of computers located throughout the world -- a distribution network that ivi did not develop and over which ivi has no control; ivi also claims it is subject to no regulation whatsoever and that it is not required to obtain consent from copyright owners, TV stations, or anyone else to offer its service. This combination of factors places ivi squarely outside the compulsory license that Congress intended for a different type category of service. *See* Register's Section 109 Report at 181 (only services that are "substantially similar" to systems using the Section 111 license should qualify for 111).

By: _____

Peter L. Zimroth
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York
(212) 715-1000
*peter.zimroth@aporter.com*

-- and --

Robert Alan Garrett
Hadrian R. Katz
C. Scott Morrow
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000
*robert.garrett@aporter.com*
*hadrian.katz@aporter.com*
*scott.morrow@aporter.com*
*Counsel for Plaintiffs*

Dated:  October  29, 2010

Exhibit 6

FilmOn Announces Launch of Online Pay Service Delivering HD TV Stations - 2010-09-...   Page 1 of 2

« Back | Print

## FilmOn Announces Launch of Online Pay Service Delivering HD TV Stations
### Permission secured by service remains unclear

*By John Eggerton – Broadcasting & Cable, September 28, 2010*

Add FilmOn to the list of Web sites trying to move into the online cable and broadcasting space.

On the same day that broadcasters filed suit against ivi TV for streaming TV station signals online without permission, and possibly to draft on some of the attention paid to the issue of online streaming, comes news (thanks to Michael Kilgore of **http://www.ftablog.com**) that FilmOn Monday (Sept. 27) launched a $9.95-per-month high-definition service that included what it called "premium free to air television channels" including CBS, ABC, NBC, Fox, KCAL and KTLA, as well as various international satellite channels.

Actually, the service launched in standard definition, but its founder says it will begin HD service Oct. 1.

"Our platform is designed to be easily customized for broadcasters and advertisers who wish to get into the online broadcast business quickly and with minimal expense. FilmOn is currently in negotiations with all major cable providers and plans to provide complete syndicated cable television services throughout the U.S. in 2011," said Alki David, FilmOn Chairman in the release, which identifies him as a "serial internet entrepreneur."

He is also described as a prankster, having publicly offered $1 million to anyone who streaks in front of President Barack Obama. But FilmOn does not appear to be any prank, and the issue is streaming rather than streaking.

In an interview with B&C, David said that he has not negotiated individual carriage deals with the broadcasters, though for some other content he does have deals.

Ivi argues that it fits the definition of cable system when it comes to the statutory license to retransmit broadcast signals over the air per U.S. Copyright law, but that it is not a cable system when it comes to the Communications Act requirement to obtain express permission from a station before such retranmssion.

David said he sees it the same way, but that he has been around a lot longer that ivi (FilmOn has been in beta since September 2009). He also says he wants to respect syndicated rights and copyright, but adds that :it is "without doubt that cable providers in the coming years will be using IP to deliver IP. The principle of what we are doing is causing a stir."

"We have contacted all of the major broadcasters," David  said, "but we are certainly protecting ourselves on the premise of the copyright act.  The argument is that in the future, IP is the deliverable platform of choice."

Ivi TV asked a court to rule that it is not infringing on copyright after broadcasters sent them cease and desist letters.

David said he has not gotten any letters yet, but expects them and says that if he does get them he will also ask for a declaratory ruling from the court. "Absolutely. If somebody wants a fight, bring it on," he said.

An executive with NBC had not gotten a response from its lawyers at press time, but a Fox executive said nobody there knew about the service.

« Back | Print

© 2010 NewBay Media, LLC. 810 Seventh Avenue, 27th Floor, New York, NY 10019 T (212) 378-0400 F (212) 378-0470